IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CR404 |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| HIGINIO SOLORIO, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on the motion of defendant Higinio Solorio (Solorio) to suppress (Filing No. 22). Solorio seeks to suppress evidence seized from Solorio's vehicle by law enforcement officers on November 27, 2002. Solorio is charged in the Indictment with a conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine during the period of January 1, 1999 to January 1, 2003, in violation of 21 U.S.C. § 846.

An evidentiary hearing was held on the motion on January 10, 2005. At the hearing, the court heard testimony from Officer Jon E. Clark (Officer Clark) of the Council Bluffs Police Department (CBPD). A transcript of the hearing (TR.) was prepared and filed on January 19, 2005 (Filing No. 26). Post-hearing briefing was completed on February 10, 2005.

**FINDINGS OF FACT**

On November 27, 2002, Officer Clark was on duty in uniform and driving a marked CBPD patrol car (TR. 4-5). The previous day, Officer Clark was informed there was a search warrant which would be executed at the address of 2923 Poplar Drive in Council Bluffs by a multi-jurisdictional drug task force and Officer Clark may be needed to assist in stopping vehicles which may be leaving the targeted residence (TR. 24-25). While patrolling near Poplar Drive in Council Bluffs at approximately 1:24 in the afternoon on November 27, 2002, Officer Clark observed a red 1997 Ford F-150 pickup truck back out of the driveway at 2923 Poplar Drive (TR. 5, 26). As Officer Clark drew closer, he noted the pickup did not bear any

license plates as required by Iowa law (TR. 5). Officer Clark also noted an in-transit sticker was displayed on the right-hand side of the rear window (TR. 6). Officer Clark believed the in-transit sticker to be improperly displayed as Iowa laws require the in-transit sticker to be displayed on the upper left-hand corner of the rear window of a vehicle (TR. 8). Accordingly, Officer Clark initiated a traffic stop of the pickup truck (TR. 8). The pickup truck had traveled no more than two blocks before Officer Clark stopped the pickup truck by engaging the patrol car's emergency lights and a short burst of the siren (TR. 8). After he stopped the pickup, Officer Clark made contact with Trooper Hitchcock with the multi-jurisdictional task force (TR. 26). When the pickup truck stopped, Officer Clark got out of his patrol car and approached the pickup truck on the driver's side of the pickup truck (TR. 9). In accordance with his usual routine, Officer Clark believed he asked the driver for a driver's license, vehicle registration, and insurance information (TR. 10). Officer Clark requested the documents using the English language (TR. 11). The driver, who was the defendant, produced a driver's license in the name of Jose Hernandez Solorio (TR. 9). Solorio responded (indicating is understanding) to Officer Clark's questions in English (TR. 28). Solorio did not produce any registration or insurance information (TR. 10). There were two other occupants of the pickup truck, Herlindo Garibay Gaona, a front seat passenger, and Crecenia Lozano Gutierrez, a back seat passenger (TR. 11-12).

In English, Officer Clark asked Solorio to step out of and to the rear of the pickup truck (TR. 12). At this time, another CBPD officer, Officer Kozad, had arrived to assist Officer Clark and joined Officer Clark while Officer Clark was talking to Solorio at the rear of the stopped pickup (TR. 12-13). In English, Officer Clark asked Solorio whether Solorio had any drugs, weapons, alcohol or contraband in the pickup truck (TR. 13). Solorio stated he did not have anything in the pickup (TR. 13). Again in English, Officer Clark asked Solorio if he could search the vehicle (TR. 13). Officer Clark testified he could not recall Solorio's exact words but Solorio gave Officer Clark a positive indication allowing Officer Clark to search the pickup truck (TR. 13). Officer Clark believed Solorio to sober, coherent and not under the influence of alcohol or drugs (TR. 14). Officer Clark did not threaten Solorio or promise him anything in order for Solorio to agree to allow the search of the pickup truck (TR. 14).

Officers Clark and Kozad directed the passengers to get out of the pickup truck and step to the rear of the pickup truck (TR. 15). As Officer Kozad was about to search the pickup truck by walking to the passenger side of the pickup truck, Solorio stated to Officer Clark that there was "22" in the pickup truck (TR. 16). When Officer Clark asked Solorio what Solorio meant by a "22," Solorio said there was 22,000 dollars under the passenger seat (TR. 16). Officer Clark informed Officer Kozad of Solorio's comment, and Officer Kozad reached under the seat and pulled out a bundle of money (later counted and found to total $21,980) (TR. 16). While standing at the rear of the pickup truck, Officer Clark engaged Solorio in conversation in English about the currency found in the pickup truck (TR. 17). When asked what the money was for and where it came from, Solorio stated they were selling the pickup truck to the person at Poplar Drive where Officer Clark had observed them (TR. 17). Solorio stated that person had paid $22,000 for the pickup truck but was allowing them to drive back home to pick up a second vehicle and later bring the pickup truck back and drop it off at the residence at Poplar Drive (TR. 17). When asked where home was, Solorio told Officer Clark home was in Grand Island, Nebraska (TR. 17).

Officer Clark directed Officer Kozad to replace the money under the seat, and Officer Clark called for a state trooper canine unit to come to the scene (TR. 17). Since Solorio and the passengers stated they were cold, Officer Clark directed Solorio and the passengers to be seated in the patrol car and Officer Clark removed the keys to the pickup truck (TR. 17). Trooper Hitchcock from the Iowa State Patrol later arrived with a canine and subjected the pickup truck to a canine sniff (TR. 18). The only item found in the pickup truck was the currency (TR. 38). After Trooper Hitchcock arrived, Officer Vasquez of the CBPD arrived at the scene (TR. 18). Since the two passengers did not speak English but spoke Spanish, Officer Vasquez, who does speak Spanish, was used as a translator in obtaining information from the passengers (TR. 18). In so doing, Officer Vasquez determined that all three occupants of the pickup truck did not have any papers to be legally in the United States (TR. 19). Trooper Hitchcock contacted the INS and had the three occupants transported to the CBPD station where a telephone hearing was to be held with the INS (TR. 19). In the meantime, the pickup truck was driven to the CBPD station (TR. 20). After the INS made a determination to hold all

three individuals, the pickup truck was impounded pursuant to CBPD written policies (TR. 20). The cash was placed in the property room of the CBPD (TR. 21).

## LEGAL ANALYSIS

Solorio asserts (1) Officer Clark did not have a basis to conduct a traffic stop of Solorio's vehicle, (2) any detention of Solorio and the vehicle following the traffic stop exceeded a reasonable time, and (3) the detention was not based on a reasonable articulable suspicion of criminal activity. Solorio further asserts any consent to search by Solorio was not voluntary or was obtained during a period of unlawful detention.

### A. Traffic Stop

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." **United States v. $404,905.00 in U.S. Currency**, 182 F.3d 643, 646 (8th Cir. 1999) (**citing Pennsylvania v. Mimms**, 434 U.S. 106, 109 (1977)). Any traffic violation, however minor, gives a police officer probable cause to stop a vehicle. **United States v. Bell**, 86 F.3d 820, 822 (8th Cir. 1996). Once the officer has probable cause to stop a vehicle, any ulterior motive of the officer becomes irrelevant. **Whren v. United States**, 517 U.S. 806 (1996).

Solorio argues Officer Clark was mistaken as to his interpretation of Iowa law regarding where an in-transit sticker must be placed on the rear window of a vehicle. Officer Clark testified he believed the in-transit sticker must be placed on the upper left side of the rear window rather than the right side of the rear window which he observed on Solorio's pickup truck. The Iowa statutes which the government offered at the time of the hearing and requested the court to take judicial notice do not specifically require all in-transit stickers to be placed in the left rear window of a vehicle. Iowa Code § 321.109(3) requires a delinquent registration permit to be "displayed in the upper left-hand corner of the rear window of all motor vehicles, except motorcycles." This section does not refer to general in-transit stickers. The court is unable to discern from the statutes and ordinances proffered by the government what Iowa law is regarding the proper display of in-transit stickers. The court does not feel

4

compelled to search the Iowa statutes and Council Bluffs city ordinances to find the authority suggested by the government.[1]  However, the court does find that at the time Officer Clark stopped Solorio's vehicle, Officer Clark had a reasonable belief that Iowa state law and Council Bluffs city ordinances required the display of an in-transit sticker in the upper left-hand portion of the rear window of a motor vehicle.

The validity of a traffic stop depends on whether the officer's actions were objectively reasonable under the circumstances. **United States v. Sanders**, 196 F.3d 910, 913 (8th Cir. 1999).  Whether an officer makes a mistake of law or a mistake of fact relating to his determination that a traffic violation occurred is irrelevant to a Fourth Amendment inquiry. The sole issue is whether any mistake was an objectively reasonable one.  **United States v. Smart**, 393 F.3d 767, 770 (8th Cir. 2005) (Officer's mistake as to display of license plates); **see also United States v. Flores-Sandoval**, 366 F.3d 961, 962 (8th Cir. 2004) (Trooper reasonably believed vehicle was in violation of Nebraska law even though the vehicle was not technically in violation).

The court does not find the stop to be pretextual.  Whether a traffic stop is pretextual is measured against a standard of "objective reasonableness." **United States v. Cummins**, 920 F.2d 498, 501 (8th Cir. 1990) (**quoting Scott v. United States**, 436 U.S. 128, 138 (1978)).  "Even assuming [the police officer] was looking for [the defendant], it would be 'objectively reasonable' to pull over a vehicle which was" engaging in a traffic offense. **United States v. Miller**, 20 F.3d 926, 929 (8th Cir. 1994).  Accordingly, the court finds Officer Clark's stop of Solorio's pickup truck did not violate the Fourth Amendment.

### B. The Detention

Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and the issuing of a citation. ***$404,905.00,***

---

[1] "Judges are not like pigs, hunting for truffles buried in briefs." **United States v. Stuckey**, 255 F.3d 528, 531 (8th Cir. 2001) (**quoting United States v. Dunkel**, 927 F.2d 955, 956 (7th Cir. 1991)).

182 F.3d at 647; **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Additionally, the police officer may inquire about the motorist's destination, purpose of the trip and whether the police officer may search the vehicle.  *$404,905.00,* 182 F.3d at 647; *U.S. v. Allegree,* 175 F.3d 648, 650 (8th Cir. 1999).  The police officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made the police officer regarding illegal drug use, and divergent information from the passengers.  *$404,905.00,* 182 F.3d at 647; *Allegree,* 175 F.3d at 650-51.  It was during this inquiry of Solorio after Solorio was asked to step to the rear of the pickup truck, that Officer Clark asked for and received permission to search the pickup truck.  Since Officer Clark was authorized to make the inquiries he did, the time of Solorio's detention at the rear of the pickup truck was authorized and lawful. [2]

### C. Consent to Search

Solorio was asked whether Officer Clark could search the pickup and Solorio consented.  "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion."  *United States v. Meza-Gonzales*, 394 F.3d 587, 592 (8th Cir. 2005).  The Fourth Amendment test for valid consent to search is that the consent be voluntary, and such "[v]oluntariness is a question of fact to be determined from all the circumstances."  *Ohio v. Robinette,* 519 U.S. 33, 40 (1996).

There is no evidence that the consent was not voluntarily given by Solorio.  While the consent was given during a traffic stop with police officers at his side, there is no evidence in the record to substantiate that Solorio did not understand Officer Clark's request, that Solorio was threatened in any manner, or that any coercion was used to obtain Solorio's consent.  The currency was found during the consensual search of the pickup truck and following Solorio's volunteered statement that the twenty-two thousand dollars were in the truck.  Solorio's explanation of the currency provided a reasonable suspicion for Officer Clark to further detain the pickup and occupants for the arrival of Trooper Hitchcock and a drug canine.  Solorio's

---

[2] It should be remembered that Solorio could not produce anything other than a driver's license when requested by Officer Clerk to produce registration and insurance documentation.

6

explanation that he retained the currency after selling the car to the person on Polar Drive and still having possession of the pickup truck to go to Grand Island, Nebraska, was entirely suspect, especially when a drug task force was about to serve a search warrant at the address on Poplar Drive. Thus, an investigative detention was warranted. ***Terry v. Ohio***, 392 U.S. 1, 27, 32-33 (1968).

### D.  Further Detention and Impoundment

While waiting for Trooper Hitchcock to arrive with the canine, Solorio and the passengers were seated in the patrol vehicles. After Trooper Hitchcock arrived and after a Spanish speaking officer arrived, it was determined that Solorio and his two passengers were illegally in the United States and were held for INS authorities. The pickup was impounded in accordance with CBPD policies, and the currency was booked into the CBPD property room. Neither action contravened the Fourth Amendment and Solorio's motion to suppress should be denied.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP** that Solorio's motion to suppress (Filing No. 22) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation. Failure to timely appeal or object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 13th day of April, 2005.

> BY THE COURT:
>
> s/Thomas D. Thalken
> United States Magistrate Judge